******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.*
GREGORY E. MCLAURIN
(AC 44523)

Alvord, Seeley and DiPentima, Js.

*Syllabus*

Convicted of several crimes in connection with his role in the robbery of
a restaurant, the defendant appealed to this court, claiming that the
trial court improperly denied his motion to suppress evidence of his
identification by B, an employee of the restaurant, during a one-on-
one showup procedure arranged by the police. The defendant and an
accomplice, F, had forced the restaurant's employees at gunpoint to
give them money from the restaurant's safe and cash registers before
fleeing on foot across a heavily trafficked road. Within ten minutes after
receiving the call regarding the armed robbery, the police apprehended
F and detained him in the parking lot of a car dealership about 800 feet
from the crime scene, where they had set up a staging area. While the
police continued to search for the defendant, an officer drove B from
the restaurant to the car dealership, which was well lighted, for a one-
on-one showup identification during which she promptly identified F
as one of the robbers. After the police apprehended the defendant a
short time later, they drove B from the restaurant back to the staging
area where, without hesitation, she identified the defendant less than
ninety minutes after the robbery. *Held* that the trial court did not abuse
its discretion in denying the defendant's motion to suppress the evidence
of B's identification of him, as the one-on-one showup identification
procedure the police conducted was not unnecessarily suggestive in
light of the exigencies of the situation: the police, who had found a gun
in the restaurant, had no way of knowing whether other weapons were
involved in the robbery, it was reasonable for the police to believe that
the suspects remained armed and dangerous, which justified the need
to act quickly, and the officers' belief that the safety of the public was
at risk was confirmed when they apprehended F with an eight to nine
inch knife on his person while the defendant was still at large; moreover,
the showup identification was justified by the need to quickly confirm
whether the defendant was the second perpetrator or whether the police
needed to continue their search, and, even though there did not appear
to be a risk that B would later become unavailable, the immediacy of
her identification of the defendant ensured that she viewed him while
her recollection was still fresh, and it was particularly important because
the defendant wore a mask during the robbery and B had been able to
see only his clothing, eyes, mouth and portions of his skin; furthermore,
the police did not, as the defendant contended, conduct the showup in
a suggestive place or stage it in a suggestive manner by returning B to
the parking lot where she had identified F about thirty minutes earlier
but, rather, took significant steps to minimize the inherent sugges-
tiveness of a showup identification by transporting B to a neutral loca-
tion, the car dealership, where the defendant was seated in an ambu-
lance, rather than in a police car, during the identification procedure,
the police did not indicate to B that the person she would be viewing
was the person responsible for the crime, and the fact that the defendant
was handcuffed during the showup did not render the identification
procedure unnecessarily suggestive.

Argued September 15—officially released November 8, 2022

*Procedural History*

Substitute information charging the defendant with
four counts of the crime of unlawful restraint in the
first degree and with one count each of the crimes of
robbery in the first degree, conspiracy to commit rob-
bery in the first degree, criminal possession of a firearm,
carrying a pistol without a permit, larceny in the fourth

degree and conspiracy to commit larceny in the fourth degree, brought to the Superior Court in the judicial district of Ansonia-Milford, where the court, *Brown, J.*, denied the defendant's motion to suppress certain evidence; thereafter, the case was tried to the jury before *Brown, J.*; verdict and judgment of guilty of four counts of unlawful restraint in the first degree, and of robbery in the first degree, conspiracy to commit robbery in the first degree, criminal possession of a firearm, carrying a pistol without a permit and conspiracy to commit larceny in the fourth degree; subsequently, the court, *Dennis, J.*, rendered judgment revoking the defendant's probation, and the defendant appealed to this court. *Affirmed.*

*Daniel J. Krisch*, assigned counsel, for the appellant (defendant).

*Nathan J. Buchok*, deputy assistant state's attorney, with whom, on the brief, was *Margaret E. Kelley*, state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Gregory E. McLaurin, appeals from the judgment of conviction, rendered after a jury trial, of robbery in the first degree with a deadly weapon in violation of General Statutes § 53a-134 (a) (2), conspiracy to commit robbery in the first degree with a deadly weapon in violation of General Statutes §§ 53a-48 and 53a-134 (a) (2), criminal possession of a firearm in violation of General Statutes § 53a-217, carrying a pistol without a permit in violation of General Statutes § 29-35 (a), four counts of unlawful restraint in the first degree in violation of General Statutes § 53a-95, and conspiracy to commit larceny in the fourth degree in violation of General Statutes §§ 53a-48 and 53a-125. On appeal, the defendant claims that the trial court improperly denied his motion to suppress a one-on-one showup identification. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. On January 19, 2018, at approximately 8:30 p.m., the defendant and another individual, Royshon Ferguson, entered a Smashburger restaurant on Boston Post Road in Milford. Both men were wearing ski masks, but their eyes, mouths, and the skin around their eyes and mouths were visible. The defendant was carrying a silver-colored, semiautomatic gun in his hand.

There were three employees working at the restaurant that night. Jada Brinkley and Jamal McNeil were working in the front of the restaurant, and Casey Deloma, the shift lead, was in the back room, which was brightly lit and contained a small safe. There were four customers dining in the front of the restaurant. When the defendant and Ferguson entered Smashburger, two of the customers attempted to flee. The defendant pointed the gun at them and told them, "don't run." The defendant then gathered the customers and employees at gunpoint and directed them to the back of the restaurant, where Deloma was located.

Once in the back room of the restaurant, the defendant handed the gun to Ferguson, who pointed it at Deloma and told her to unlock the safe. Deloma attempted to unlock the safe twice using a code, but it did not unlock. Ferguson told her, "I'm going to give you ten seconds or I'm going to shoot you." Deloma entered the code again and opened the safe. Ferguson took the money out of the safe and put it in his pockets. During this time, the defendant was standing in the back room, next to Brinkley.

After taking money out of the safe, Ferguson took Deloma to the front of the restaurant at gunpoint and directed her to open the cash registers. She opened the first register, and Ferguson began to take money from it while she opened the second register.[1] The defendant

remained in the back room of the restaurant with the other victims. The defendant demanded that the victims give him their cell phones. At that point, one of the customers, Garfield Stewart, who was lawfully carrying a concealed firearm, drew his weapon on the defendant, who immediately took off running. As Stewart gave chase, the defendant ran into the front of the restaurant, past Ferguson, and out the front door. Stewart then pointed his gun at Ferguson, who was bent over a cash register, and started banging Ferguson's hand until he released the gun. Ferguson ran out of the restaurant, exiting within seconds of the defendant. The defendant and Ferguson fled in the same direction, turning right out of the front door and running down Boston Post Road.

At approximately 8:40 p.m., the Milford Police Department received a high priority call that an armed robbery was in progress at Smashburger on Boston Post Road. Three minutes later, Officer Matthew Joy arrived to a chaotic scene and immediately turned on his body camera. As the first responding officer on scene, Officer Joy secured the scene, ensured that no suspects remained on the premises, and determined that the employees and customers were uninjured. Additionally, he located a gun on the floor behind the front counter of the restaurant. After speaking with the employees and customers, Officer Joy learned that two suspects had fled the restaurant on foot, turning right out of the front door. One suspect, later identified as Ferguson, was described as "a black male, about five feet, six inches, heavyset, wearing jeans and a dark colored . . . hooded sweatshirt . . . ." The other suspect, later identified as the defendant, was described as "a black male, approximately six feet, six foot one, a thinner build wearing jeans, a red hooded sweatshirt with a dark colored top coat layer." Officer Joy did not receive descriptions of the suspects' faces because he was told that they were wearing dark-colored ski masks, one black and one green.

Officer Joy promptly relayed a description of the suspects to his fellow officers over his portable police radio. A passing motorist flagged down police officers responding to the scene and reported that he had just seen two black males run into a wooded area, behind a car dealership and storage facility, that was located approximately 800 feet across the street from Smashburger. At that time of night, there was limited pedestrian activity on Boston Post Road, but there was significant vehicular traffic.

Officer Sean Owens, a canine handler, and his partner, Canine Officer Czar, responded to the wooded area behind the car dealership. It was a cold night, there was some ice on the ground, and the wooded area was dimly lit. Officer Owens casted[2] Czar into the general area where the subjects were last seen, and Czar imme-

diately alerted to an apocrine odor, a particular odor that humans emit when they are emotionally charged or fearful. Czar began pulling south along the overgrown grass and wood line that ran between the storage facility and wooded area. Upon reaching the car dealership parking lot, Czar displayed a proximity alert[3] and then pulled deeper into the wooded area, toward a marsh, for approximately twenty-five to thirty yards, when Officer Owens saw the first suspect, later identified as Ferguson. Officer Owens, and his fellow officers who were providing backup, gave several verbal commands for Ferguson to get down on the ground and show his hands. Ferguson ignored the officers' commands and reached for his waistband, which prompted Officer Owens to give Czar a command to apprehend Ferguson. Czar subdued Ferguson with a bite to the leg. Once Ferguson complied with Officer Owens' commands, Czar was removed, and Officer Christopher Deida detained Ferguson.

Officer Deida searched Ferguson, who told him that he had a knife on his person. Officer Deida located an eight to nine inch kitchen knife in the front pocket of Ferguson's sweatshirt. Additionally, officers found $868 in cash on Ferguson, with many of the bills "hanging out of his pockets." Ferguson told Officer Deida that his friend "jumped the fence" and pointed to a nearby chain-link fence with barbed wire that ran along the wooded area. Officer Deida and another officer moved Ferguson from the wooded area to the parking lot of the car dealership, where the officers had set up a staging area. The officers had called an ambulance to the car dealership, and Ferguson was treated for his dog bite.

At 8:50 p.m., ten minutes after the police received the call regarding the armed robbery, Officer Joy, who had remained on scene at Smashburger, received a radio transmission informing him that a suspect had been apprehended. Sergeant Christopher Dunn,[4] Officer Joy's commanding officer, instructed him to conduct an eyewitness showup,[5] at the car dealership, with a victim. Officer Joy selected Brinkley because he determined that she had the best view of the robbers. Shortly thereafter, Officer Joy brought Brinkley to the car dealership where she identified Ferguson as one of the robbers, without hesitation and within less than one minute.

Meanwhile, Officer Owens and Czar continued to search for the second suspect. Officer Owens attempted to get Czar back on task, which was difficult because of the excitement surrounding Ferguson's apprehension and the additional personnel in the area whose odor began to contaminate the scene. For twenty to thirty minutes, Officer Owens and Czar continuously tracked within the wooded area, even rechecking certain areas. Czar continued to return and show interest

in the marsh area, near where Ferguson was found, and Officer Owens "felt confident that there was somebody else in this area." However, Officer Owens became concerned that Czar was getting tired, and that the scene was overwhelmingly contaminated, so he decided to end the track and return Czar to his vehicle to regroup. As they began to walk back to the vehicle along the back of the storage building, Czar changed his behavior, hooked his head,[6] and pulled Officer Owens toward the marsh, deep within the wooded area.

Officer Owens found the second suspect about fifty to sixty yards from where Ferguson was apprehended and in a location "where the dog . . . twenty minutes earlier, wanted to kind of get into . . . ." The second suspect, who was later identified as the defendant, was "hunkered down in head high thickets . . . well hidden . . . in close proximity to all the noise and everything else going on for the first subject." Officer Owens told the defendant to show him his hands, but the defendant attempted to flee deeper into the woods and marsh. At that point, Officer Owens gave Czar the command to apprehend the defendant, which Czar did with a bite to the lower leg. As the only officer in the woods at that time, Officer Owens handcuffed the defendant, removed Czar, and radioed for backup. Officers took the defendant to the car dealership parking lot where medical personnel attended to his dog bite injury.

At 9:42 p.m., Officer Joy received information that a second suspect had been detained at the car dealership. Officer Joy was instructed to bring Brinkley back to the car dealership to conduct the second showup identification. After arriving at the car dealership, Brinkley identified, without hesitation, the defendant as one of the robbers.

On January 20, 2018, the day after the robbery, officers returned to the area where the defendant and Ferguson were apprehended to search for additional evidence. Officers recovered one black, knit ski mask, a black knit glove, and a ten dollar bill Additionally, officers recovered a camouflage jacket, which was located over the top of a tall chain-link fence with barbed wire along the top. The jacket was spread out, as though someone had used it as protection when trying to climb over the fence.

The defendant was subsequently arrested and charged with robbery in the first degree, conspiracy to commit robbery in the first degree, criminal possession of a firearm, carrying a pistol without a permit, four counts of unlawful restraint in the first degree, larceny in the fourth degree, and conspiracy to commit larceny in the fourth degree.

On June 11, 2019, the defendant filed a motion to suppress the identification evidence of him as improper, unreliable, and unnecessarily suggestive. The court held

a hearing on the motion to suppress on July 15, 2019, prior to the start of trial. During the hearing, the state presented evidence from Officer Joy and Brinkley. The defendant cross-examined the state's witnesses but did not call any witnesses in support of his motion to suppress.

During the hearing, Officer Joy testified that, seven minutes after he had arrived at Smashburger, he received a radio transmission informing him that fellow officers had detained a suspect, later identified as Ferguson, at a car dealership across the road. Officer Joy was instructed to bring one witness to conduct a showup identification. He chose Brinkley because "[s]he was the employee near the front register closest to the front of the store [and she had] encountered the suspects first." Officer Joy testified that he had turned his body camera on upon arriving at Smashburger at 8:43 p.m. and that he had it recording the entire time he was on scene.

Officer Joy transported Brinkley to the car dealership in his patrol cruiser. Brinkley was seated in the rear driver's side seat, separated from Officer Joy by a metal and glass divider. Prior to showing Brinkley the suspect, Officer Joy read Brinkley the preprinted rules and instructions form for identification procedures, which had been provided to him by the supervisory sergeant on duty that evening. Officer Joy did not communicate to Brinkley that the police had the person in custody who was responsible for the robbery. After reading her the instructions, Officer Joy provided Brinkley with the opportunity to ask questions. Brinkley did not have any questions and appeared to understand the instructions.

At the dealership, Officer Joy rolled down Brinkley's window. The car dealership was well lit by the lights from the ambulance and streetlamps. Officer Joy's cruiser lights were on but did not face toward the suspect. At 9:12 p.m., Brinkley identified Ferguson as the first suspect, promptly and without hesitation. Following the identification, Officer Joy transported Brinkley back to Smashburger. He testified that, upon returning to the restaurant, he obtained written statements from the employees and customers who were present at the time of the robbery.

At 9:42 p.m., Officer Joy received a radio transmission informing him that a second suspect had been detained at the car dealership. Officer Joy was instructed to bring Brinkley back to conduct a showup identification. Officer Joy read Brinkley an identification instructions and advisement form, which Brinkley signed. He did not, in any way, indicate to Brinkley that the suspect she was going to view was responsible for the crime.

Upon arriving at the car dealership, Officer Joy proceeded to the same location where Brinkley previously had identified Ferguson. As with the prior identification,

Brinkley was seated in the rear driver's seat and viewed the defendant out of the rolled down window. The area remained well lit. The defendant was seated in the back of an ambulance, approximately two to three car lengths from Officer Joy's cruiser. Officer Joy did not recall whether the defendant was handcuffed at the time or whether there were officers standing near the defendant. Officer Joy testified that Brinkley identified the defendant as the second suspect at 9:56 p.m. and that she did not hesitate in making the identification.

Officer Joy testified that the exigent circumstances necessitating a showup identification of the defendant were "that an armed robbery had just occurred with a firearm and the suspects who had left the scene of the crime on foot, after having one suspect detained, possibly could still have other weapons on their person." He explained that it was "exigent to either clear or positively identify the suspect to make sure that they aren't further armed or clear the person who is being [identified]." Additionally, Officer Joy testified that it was important to eliminate the defendant as a suspect in the event that the perpetrator remained in the community. Moreover, he testified that, during the course of the investigation, he learned that Ferguson had been apprehended with a knife and that he did not know how many weapons were involved in the incident.

During cross-examination of Officer Joy, defense counsel introduced a document titled "Milford Police Department General Orders—Eyewitness Identification" over the objection of the state. Defense counsel highlighted a portion of the document, which stated that "[s]howup identification procedures are employed soon after a crime has been committed, when a suspect is detained at or near the crime, or under exigent circumstances such as the near death of the eyewitness or victim." Officer Joy confirmed that the contents of the paragraph were accurate and answered in the negative when asked whether anyone was in a near death state at the time of identification.

Brinkley testified during the hearing that, in January, 2018, she was working as a cashier at Smashburger. When asked about a night in January, 2018, when two people came into the restaurant, she testified that she had no memory of the event or the night in question. She testified, "I just got into a car accident. I was unconscious, don't remember. I smoke weed. . . . I do not remember this night . . . ." The prosecutor showed Brinkley four clips of footage from Officer Joy's body camera wherein Brinkley can be seen and heard identifying Ferguson, identifying the defendant, and discussing the suspects' physical features and clothing. Brinkley confirmed that it was her voice and image in the clips but testified that she had no recollection or memory of the captured events.

The prosecutor also introduced Brinkley's written

statement to the police in which she described the appearance of the robbers. Brinkley confirmed that the statement was handwritten and signed by her but testified that she had no recollection of writing the statement or the contents of the statement. Additionally, when shown the eyewitness instructions for identification procedures, which Officer Joy testified that he had read to Brinkley prior to her identification of the defendant, Brinkley confirmed that she had signed and dated the document. On cross-examination, Brinkley testified that she "[m]ost likely" smoked "weed" on the day of the robbery but ultimately stated that she did not know if she had done so.

Following the presentation of evidence at the hearing, defense counsel argued that Brinkley's identification should be suppressed on three grounds: (1) law enforcement did not comply with General Statutes § 54-1p, which requires the use of fillers in lineups and photographic arrays, but that here, the defendant was the only person presented;[7] (2) Milford Police Department procedure allows for the use of showup identifications under certain circumstances, which were not present in this case;[8] and (3) Brinkley had no recollection of making the identification. In concluding his argument, defense counsel stated, "the prejudicial effect of this procedure in identifying the defendant as the person who perpetrated the crime far outweighs the probative value."

In response, the prosecutor argued that the relevant standard was the two-pronged due process standard, which required the defendant to prove that the showup identification was both unnecessarily suggestive and unreliable, not a probative-prejudicial balancing test. The prosecutor argued that the defendant had not met his burden of proof. As to the first prong, the prosecutor argued that the showup procedure was not unnecessarily suggestive under the circumstances at issue, in which the two perpetrators had committed an armed robbery and fled the scene on foot, the police had an available eyewitness with a fresh memory of the perpetrators and needed to determine whether the defendant was the perpetrator or whether to continue searching for the perpetrator to safeguard the public. The prosecutor argued further that, even if the court concluded that the showup identification procedure was unnecessarily suggestive, it was nevertheless reliable because of "the detail of the description, the accuracy, [and] the quick identification . . . ."

The court stated that it had reviewed relevant case law and then orally denied the defendant's motion to suppress the identification evidence. In issuing its ruling, the court stated: "The court has had an opportunity to consider the motion to suppress identification, consider the testimony of Officer Joy and the testimony of Ms. Brinkley as well, and argument by counsel. The

court finds that the identification, given all the facts and circumstances, was not unduly suggestive."[9]

At trial, Officer Joy testified in a manner consistent with the testimony he provided at the suppression hearing. He reiterated that, given the nature of the crime and the fact that a firearm was found on scene, it was "a priority, probably the main priority, to get out information regarding the suspects' location, direction of travel, description . . . as quick as possible, because you don't know if they're still armed. You don't know what they could be armed with, how many weapons. You know, there's already one weapon found on the scene prior to them leaving and it's a public safety issue as well as a time sensitive issue on, you know, capturing the subjects." Similarly, Officer Christopher Lennon, who was flagged down by the passing motorist that evening, testified that he and his fellow officers "didn't stop to take [the motorist's] name or information because we heard that there was a firearm involved in the robbery so we figured it was more important that we try to apprehend the suspects."

During cross-examination of Sergeant Dunn, who, at the time of the robbery, was supervising Officer Joy at Smashburger, defense counsel asked whether there was an emergency that necessitated a showup identification. Sergeant Dunn responded: "No, there was a request from the captain." During cross-examination of Detective Michael Cruz, who was in charge of the investigation, defense counsel inquired whether "there [was] anything that prevented [the officers] from doing a photo lineup of [the defendant] with the witnesses and the employees of Smashburger?" Detective Cruz responded that, "for this case and my training and experience the showup was appropriate. I believe there is enough probabl[e] cause on that night to arrest the two defendants for the robbery." When defense counsel again asked whether there was anything that prevented the officers from "doing a photo lineup" with the other witnesses and restaurant employees, Detective Cruz responded, "[n]o." Defense counsel then asked whether there was anything that prevented the officers from doing a "live lineup" with the defendant and the other restaurant employees, and Detective Cruz responded, "[n]o."

Brinkley also testified in a manner consistent with her testimony at the suppression hearing. She testified that, as a result of a recent car accident and regular marijuana use, she has a "short memory" and has no recollection of what happened on the night of the robbery. On cross-examination, Brinkley testified that she "most likely" smoked weed on the day of the robbery because she "get[s] high almost every day . . . ." When asked how she was feeling on the day of the robbery, however, she stated, "I don't remember too much . . . ." Detective Cruz, who spoke with Brinkley on the

night of the robbery, testified that she did not appear to be under the influence of any drugs that evening and that he did not have any concern about her participating in the showup identification on that night.

Due to Brinkley's lack of recollection, the court admitted into evidence, under *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986),[10] the signed witness statement Brinkley gave to the police on the night of the robbery. Brinkley read the statement aloud in its entirety.[11] Additionally, the prosecutor showed the jury four video clips that were recorded from Officer Joy's body camera on the night of the robbery.[12] In the first two clips, Brinkley can be heard identifying Ferguson. In the third clip, Brinkley can be heard discussing the mask color of the "skinny" perpetrator. In the fourth clip, Brinkley can be heard identifying the defendant at the staging area. When asked if she recognized the individual's clothing, she stated: "Yep, I see. Can you put some light on his jeans?" Once the perpetrator stands up, Brinkley can be heard saying: "Yep, that's him." When asked how sure she is, she can be heard saying: "Yup, I'm sure."

The jury found the defendant guilty of all counts, except for larceny in the fourth degree. The defendant was sentenced to twenty-five years of incarceration, execution suspended after eighteen years, and five years of probation.[13]

The defendant's sole claim on appeal is that the court improperly denied his motion to suppress the showup identification on the ground that it was unnecessarily suggestive and unreliable. In response, the state argues, inter alia, that the court properly concluded that the showup identification of the defendant was not unnecessarily suggestive given the exigent circumstances. We agree with the state.

"The test for determining whether the state's use of an [allegedly] unnecessarily suggestive identification procedure violates a defendant's federal due process rights derives from the decisions of the United States Supreme Court in *Neil* v. *Biggers,* 409 U.S. 188, 196–97, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and *Manson* v. *Brathwaite,* 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). As the court explained in *Brathwaite,* fundamental fairness is the standard underlying due process, and consequently, reliability is the linchpin in determining the admissibility of identification testimony . . . . Thus, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances . . . .

"With respect to the first prong of this analysis, [b]ecause, [g]enerally, [t]he exclusion of evidence from the jury is . . . a drastic sanction, [it] . . . is limited to identification testimony [that] is manifestly suspect . . . . [Consequently] [a]n identification procedure is unnecessarily suggestive only if it gives rise to a very substantial likelihood of irreparable misidentification. . . . We have recognized that [ordinarily] a one-to-one confrontation between a [witness] and the suspect presented . . . for identification is inherently and significantly suggestive because it conveys the message to the [witness] that the police believe the suspect is guilty . . . . For this reason, when not necessary, the presentation of a single suspect to a witness by the police (as opposed to a lineup, in which several individuals are presented [by] the police, only one of whom is the suspect) . . . has . . . been widely condemned . . . .

"It is well established, however, that the use of a one-on-one showup identification procedure does not invariably constitute a denial of due process, as it may be justified by exigent circumstances. . . . Thus, a showup identification procedure conducted in close temporal and geographic proximity to the offense may be deemed reasonable, and, therefore, permissible for federal due process purposes, when it was prudent for the police to provide the victim with the opportunity to identify [her] assailant while [her] memory of the incident was still fresh . . . and . . . [the procedure] was necessary to allow the police to eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay, if the victim excluded the defendant as a suspect or was unable to identify him." (Citations omitted; footnotes omitted; internal quotation marks omitted.) *State* v. *Ruiz*, 337 Conn. 612, 621–23, 254 A.3d 905 (2020).

Additionally, "the *entire* procedure, viewed in light of the factual circumstances of the individual case . . . must be examined to determine if a particular identification [procedure] is tainted by unnecessary suggestiveness. The individual components of a procedure cannot be examined piecemeal but must be placed in their broader context to ascertain whether the procedure is so suggestive that it requires the court to consider the reliability of the identification itself in order to determine whether it ultimately should be suppressed." (Emphasis in original.) *State* v. *Aviles*, 154 Conn. App. 470, 477, 106 A.3d 309 (2014), cert. denied, 316 Conn. 903, 111 A.3d 471 (2015).

"To prevail in his claim, the defendant must demonstrate that the trial court erred in *both* of its determinations regarding suggestiveness and reliability of identifications in the totality of the circumstances." (Emphasis in original; internal quotation marks omitted.) *State* v. *Wooten*, 227 Conn. 677, 685, 631 A.2d 271 (1993). "Fur-

thermore, [w]e will reverse the trial court's ruling [on evidence] only where there is an abuse of discretion or where an injustice has occurred . . . and we will indulge in every reasonable presumption in favor of the trial court's ruling. . . . Because the inquiry into whether evidence of pretrial identification should be suppressed contemplates a series of factbound determinations, which a trial court is far better equipped than this court to make, we will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *Bouteiller*, 112 Conn. App. 40, 46, 961 A.2d 995 (2009).

After setting forth his general contention that showup identifications are "widely condemned" because they are inherently and significantly suggestive and that exigency is a "narrow exception,"[14] the defendant argues that the procedure by which Brinkley identified the defendant was unnecessarily suggestive for three reasons: "First and foremost, the police admitted that they did not need to use a showup"; "[s]econd, Brinkley identified the defendant nearly ninety minutes after the crime, which belies any exigency"; and "[t]hird, the police conducted the showup in a suggestive place and staged it in a suggestive manner." In sum, the defendant contends that "the unnecessary use of a showup tempted [Brinkley] to presume that [the defendant] was the person police suspect."[15] (Internal quotation marks omitted.) The state argues, inter alia, that "the facts and circumstances of this case fit squarely within the well established jurisprudence in this state holding that, where police are engaged in a search for a possibly armed suspect fleeing from a crime scene, and detain an individual nearby who matches the description of the suspect, they are justified in using a showup to quickly determine if they have the perpetrator or need to continue searching." We agree with the state and conclude that the showup identification procedure was not unnecessarily suggestive because it was justified by exigent circumstances. We are guided by our Supreme Court's decisions in *State* v. *Wooten*, supra, 227 Conn. 677, and *State* v. *Revels*, 313 Conn. 762, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015).

In *Wooten*, two passersby witnessed the defendant drag the victim across a street to a parking lot, where he forcibly disrobed the victim and compelled her to engage in sexual acts. *State* v. *Wooten*, supra, 227 Conn. 681. While the victim was being assaulted, another passerby, Jose Hernandez, witnessed the defendant lying on top of the victim. Id. When the defendant saw Hernandez, he quickly pulled up his pants, approached Hernandez, and told him that he had paid ten dollars to have sex with the victim. Id. The defendant abruptly left the scene and ran down the street. Id. Upon being led to the scene by the two passersby, the police

obtained a description of the assailant from Hernandez, who "then got into a police car with [the officer] to reconnoiter the area in an attempt to locate the assailant" and successfully did so. Id., 682. Approximately one-half hour after the attack, the police brought the victim to where the defendant, the person Hernandez had identified as the assailant, was being detained. Id., 684. There, after being asked "to try to identify her assailant and told not to be frightened," the victim exited the police car, walked over to a distance of approximately eight to ten feet from the rear of the lit police car in which the defendant was seated, and positively identified the defendant as the person who had assaulted her. Id., 684–85. During a hearing on the defendant's motion to suppress the identification, the victim testified that, despite being reluctant to attempt the identification, "she was absolutely certain that the person in the police car was her assailant" and stated she had not been coached. Id., 685. "At the close of the hearing, the trial court concluded that the victim's identification of the defendant, although suggestive, was not unnecessarily so." Id.

Our Supreme Court agreed that, although the showup identification was obviously suggestive, it was not unnecessarily so because "the exigencies of the situation justified the procedure." (Internal quotation marks omitted.) Id., 686. The court concluded that "[t]he confrontation was not unnecessary because it was prudent for the police to provide the victim with the opportunity to identify her assailant while her memory of the incident was still fresh . . . and because it was necessary to allow the police to eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay." (Citations omitted; internal quotation marks omitted.) Id. The defendant contended that, because the victim was emotionally distraught and Hernandez had already made an identification of the defendant, the exigencies of the situation did not warrant a one-on-one identification procedure with the victim. Id., 687. The court disagreed and concluded that "[t]he immediate viewing enabled the police to focus their investigation and gave them greater assurance that innocent parties were not unjustly detained." (Internal quotation marks omitted.) Id.

Our Supreme Court's decision in *State* v. *Revels*, supra, 313 Conn. 762, is also instructive. In *Revels*, the police responded to a shooting, at about 11 p.m., and discovered the victim lying on the ground, unable to communicate, with a semiautomatic pistol near his right hand. Id., 766. While canvassing the area for suspects, the police were approached by a witness who claimed to have seen the shooting from her apartment window, approximately 265 feet away. Id., 767. The police subsequently apprehended a suspect who matched the description that the witness had provided. Id. Officers drove the witness to the location where the defendant

was "standing in the middle of the road, handcuffed and surrounded by uniformed police officers." Id. When the officer directed his cruiser's spotlight toward the defendant, the witness immediately identified the defendant, whose clothing matched the description the witness had previously provided. Id.

Our Supreme Court held that the showup identification procedure was not unnecessarily suggestive in light of the exigencies of the situation. Id., 773–74. The court recognized that it was unclear whether the gun found near the victim's body was the murder weapon but that its location made it reasonable for the police to conclude that it likely belonged to the victim. Id., 773. "It was reasonable for the police to believe, therefore, that the shooter was likely to be on the run, in the area, and armed. Safeguarding the public from a possibly armed and dangerous fugitive was an immediate and pressing need." Id. Additionally, the court concluded that "it was necessary to conduct a showup procedure in order to eliminate [the defendant] as a suspect as soon as possible so that the police could continue to search for the shooter and recover the murder weapon." Id., 773–74. Moreover, the court noted that, although there was no risk that the witness would become unavailable, the immediate identification ensured that "she viewed the suspect while her recollection was still fresh." Id., 774.

Here, as in *Wooten* and *Revels*, exigent circumstances justified the use of a showup identification of the defendant. The officers responded quickly to a high priority call concerning an armed robbery and learned that the two suspects had abruptly fled the crime scene on foot down and across a heavily trafficked road. Although the officers found one weapon at the scene,[16] the officers had no way of knowing whether other weapons were involved, and it was reasonable for them to believe that the suspects remained armed and dangerous, which justified the officers' need to act quickly. See *State* v. *Revels*, supra, 313 Conn. 775 ("[s]afeguarding the public from a possibly armed and dangerous fugitive was an immediate and pressing need"). In fact, the officers' belief that the public's safety was at risk was confirmed when they apprehended Ferguson and discovered that he was carrying an eight to nine inch kitchen knife on his person. Therefore, it was reasonable for the police to assume that the defendant was "on the run, in the area, and armed." Id., 773.

The officers were justified in conducting a showup identification, approximately 800 feet from the scene of the crime and seventy-six minutes after they arrived on scene, to quickly confirm whether the defendant,[17] who matched the description of one of the suspects, was the second perpetrator or whether they needed to continue their search. See *State* v. *Ruiz*, supra, 337 Conn. 623 ("showup identification procedure con-

ducted in close temporal and geographic proximity to the offense may be deemed reasonable"); see also *State* v. *Wooten*, supra, 227 Conn. 686–87 ("[a]n immediate viewing of the suspect may be justified where it [is] important for the police to separate the prime suspect gold from the suspicious glitter, so as to enable them . . . to continue their investigation with a minimum of delay" (internal quotation marks omitted)). Moreover, although there did not appear to be a risk that Brinkley would become unavailable, "the immediate identification ensured that [Brinkley] viewed the suspect while her recollection was still fresh." *State* v. *Revels*, supra, 313 Conn. 774. The immediacy of the identification was particularly important because the defendant was wearing a mask during the commission of the robbery; therefore, Brinkley could only see his eyes, mouth, the skin around his eyes and mouth, and his clothing. See *State* v. *St. John*, 282 Conn. 260, 279, 919 A.2d 452 (2007) (given that witnesses observed unmasked robber only from side and back, "it was important for the witnesses to be able to view the defendant as soon as possible while their memories remained fresh").

The defendant contends that there was no" 'necessity or urgency' " for conducting a showup identification because the "police admitted that they did not need to use a showup,"[18] "Brinkley was unhurt,"[19] and "the defendant was in custody." Additionally, the defendant cites to three Connecticut cases in which the court held that a showup identification procedure was unnecessarily suggestive due to the lack of exigent circumstances. See *State* v. *Gordon*, 185 Conn. 402, 414–15, 441 A.2d 119 (1981) (no exigent circumstances existed where defendant was in custody, defendant made incriminating statements, arresting officer testified he "had no doubt that he had found the assailant," showup identification did not take place at scene or at earliest opportunity, and state made no claim lineup was impractical) (overruled in part on other grounds by *State* v. *Artis*, 314 Conn. 131, 101 A.3d 915 (2014)), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982); *State* v. *Theriault*, 182 Conn. 366, 373, 438 A.2d 432 (1980) (showup was unnecessarily suggestive where police informed witness someone had been arrested, showed witness gun used in crime, took witness to identify handcuffed defendant through one-way mirror, and there was no claim lineup procedure was impractical); *State* v. *Anderson*, 6 Conn. App. 15, 22–23, 502 A.2d 446 (1986) (officers did not testify that "there was a special need to have an immediate identification made"; therefore, "case presented no danger that the opportunity for an identification would be lost unless a speedy showup was held").

There was extensive evidence regarding the exigency that necessitated using the showup procedure; thus, we disagree with the defendant's contention that the testimony of Sergeant Dunn and Detective Cruz ren-

dered the showup identification procedure unnecessarily suggestive. As set forth previously, Officer Joy testified in detail regarding the exigency of the situation at the suppression hearing and during trial. Additionally, his testimony was supported by that of Officer Lennon, who testified that, due to the severity of the crime—an armed robbery in a restaurant—the police did not gather information from the passing motorist because it was "more important that we try to apprehend the suspects." See *State* v. *Ledbetter*, 275 Conn. 534, 552, 881 A.2d 290 (2005) (focus of police investigation was to apprehend perpetrators; therefore, witness' "identification provided additional assurance that the police had done so") (overruled in part by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

Moreover, even if police officers testify, after the fact, that they possibly could have used an alternative procedure, that is not compelling because our Supreme Court has upheld the use of a showup identification under circumstances in which it may have been possible to conduct a lineup, i.e., when the suspect was in custody. See *State* v. *Revels*, supra, 313 Conn. 773–74 (although defendant was in custody, police had not recovered weapon from him; therefore, showup identification was necessary to eliminate him as suspect as soon as possible); see also *State* v. *Ledbetter*, supra, 275 Conn. 552 (police were not required to place investigation on hold, and not conduct showup identification, "as soon as they had sufficient evidence to arrest the suspects"). The cases that the defendant cites to the contrary are factually inapplicable to the present case. Here, officers testified that the severe nature of the crime necessitated the use of a showup identification to quickly determine whether the suspects were in fact the robbers in order to protect the public. Cf. *State* v. *Anderson*, supra, 6 Conn. App. 21 (defendant extensively questioned three officers during motion to suppress hearing, which resulted in "no indication that there was a special need to have an immediate identification made").

Furthermore, the defendant contends that "the police conducted the showup in a suggestive place and staged it in a suggestive manner" because they returned Brinkley to the parking lot where she had identified Ferguson thirty minutes previously, and she viewed both suspects in the same manner, "handcuffed and by the back of an ambulance," and from the same vantage point.[20] We disagree. The police, far from staging the showup suggestively, took significant steps to minimize its inherent suggestiveness. First, Brinkley was transported to a neutral location where the defendant had been taken after he was apprehended, rather than transporting the defendant back to the crime scene or conducting the showup at the police station. See *State* v. *Brown*, 113 Conn. App. 699, 704–705, 967 A.2d 127 (2009) (one-

on-one showup at crime scene was not unnecessarily suggestive because it was justified by exigencies); see also *State* v. *Gordon*, supra, 185 Conn. 414 ("circumstances of the station house showup unnecessarily suggested to the victim that she should positively identify the defendant"). Second, the defendant was seated in the back of an ambulance, not in a police car. See *State* v. *Wooten*, supra, 227 Conn. 686 (confrontation obviously suggestive where "[t]he victim must have realized that the defendant, seated alone in the rear of a police car, was a person whom the police at least believed to have had something to do with the crime"). Third, Officer Joy testified that, at no point did he indicate to Brinkley that the person she would be viewing was the person responsible for the crime. See *State* v. *St. John*, supra, 282 Conn. 278–79 (significant factors in determining showup identification procedure was not unnecessarily suggestive were that there was "no evidence that the police had suggested to the witnesses that they had to identify the defendant, that the defendant was indeed the person who had committed the crime or that the police had coerced the witnesses in any way"); cf. *State* v. *Ruiz*, supra, 337 Conn. 623 n.9 (The "procedure likely will be considered unnecessarily suggestive . . . if the police engage in conduct that is needlessly or gratuitously prejudicial. See, e.g., *Velez* v. *Schmer*, 724 F.2d 249, 250 (1st Cir. 1984) (during one-on-one showup identification procedure, police said to witnesses, [t]his is him, isn't it?") (Internal quotation marks omitted.)). Finally, as to whether the defendant was handcuffed,[21] our Supreme Court has recognized that the use of handcuffs and illumination does not render an identification procedure unnecessarily suggestive. See *State* v. *Ruiz*, supra, 337 Conn. 623; *State* v. *Revels*, supra, 313 Conn. 774. "A consideration of the entire identification procedure in light of the factual circumstances of the case"[22] reveals that the trial court did not abuse its discretion in determining that the showup identification of the defendant was not unnecessarily suggestive.[23] *State* v. *Foote*, 122 Conn. App. 258, 268, 998 A.2d 240, cert. denied, 298 Conn. 913, 4 A.3d 834 (2010).

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The restaurant manager testified that, upon running sales reports for the day, $1456 was missing after the robbery.

[2] Officer Owens testified that "casting is basically letting the dog engulf the immediate area in front of you and seeing if he picks up anything, as opposed to targeting him on say this cup right here where someone touched and this would be the evidence of I want you to smell this cup and then start your track. So, casting is more of a general, open, free of getting the odor that's right in front of you."

[3] Officer Owens testified that a proximity alert is a "change in a dog's behavior" that signifies to his handler "that someone is close, that this main pool of odor is getting stronger for the dog."

[4] We note that, at the time of trial, Sergeant Dunn had been promoted to lieutenant.

[5] Officer Joy testified that "[a] showup is when you transport a victim or witness to the area of where the suspect is detained to conduct an eyewitness

showup where they would identify whether or not that suspect is the one who, in fact, committed the crime."

[6] Officer Owens testified that "[Czar] hooked his head to a direction, meaning he's interested in something that's going on in there . . . ."

[7] In response to defense counsel's argument on the first ground, the court stated: "Well, this was meant as a showup and it wasn't meant as a lineup, right? I mean, this was not meant as a lineup, it's pretty clear. So, is your argument that showups are impermissible?" Defense counsel responded that no, that was not his argument and moved onto his second point. The prosecutor addressed defense counsel's argument, premised on § 54-1p, and argued that § 54-1p has no applicability to this case because the statute applies to lineup and photographic array identifications, not showup identifications.

[8] Defense counsel pointed specifically to language in the Milford Police Department General Orders, which states: "Showup identification procedures are employed soon after a crime has been committed when a suspect is detained at or near the crime or under exigent circumstances such as the near death of the eyewitness or a victim." In response to defense counsel's argument on the second ground, the court asked: "Was this not at or near the crime?" Defense counsel responded that it was but asserted that "there were no exigent circumstances with regard to why it needed to be done that way . . . ."

[9] Prior to filing his brief in the present appeal, the defendant filed a motion for articulation pursuant to Practice Book § 66-5. The defendant presented several questions for articulation, including, "[w]hat subordinate findings, if any, did the trial court make to support its determination that Brinkley's identification 'was not unduly suggestive?' " The state did not oppose this particular request for articulation. The court denied the defendant's motion for articulation. This court granted the defendant's motion for review of the denial of his motion for articulation but denied the relief requested therein.

[10] "In *State* v. *Whelan*, supra, 200 Conn. 753, our Supreme Court adopted a hearsay exception allowing the substantive use of prior written inconsistent statements, signed by the declarant, who has personal knowledge of the facts stated, when the declarant testifies at trial and is subject to cross-examination." (Internal quotation marks omitted.) *State* v. *Russaw*, 213 Conn. App. 311, 316–17 n.5, 278 A.3d 1, cert. denied, 345 Conn. 902, 282 A.3d 466 (2022). "Inconsistencies can be found in omissions, changes of position, denials of recollection or evasive answers. [*State* v. *Whelan*, supra], 748–49 n.4." Conn. Code Evid. § 6-10 (a), commentary.

[11] Brinkley's recitation of her statement was as follows: "On this day, January 19, 2018, at approximately 8:30 I was cleaning tables in the restaurant. As I was getting ready to walk in the back to grab a rag, I saw the door swing open and then came two black men, heavy set . . . with a dark blue hoodie, dark skin on and a mask; the other male was skinny, lighter skin, with a dark green mask, red camouflage coat on. I saw the gun in the skinny one's hand and I immediately went to the back to let my coworkers know what was behind me. I showed him where the safe was, he grabbed my arm, walked me, me and Casey, Jamal, further to the back where the safe was located. Then he pulled out the gun again and demanded someone to open the safe. It was silence. He started pointing the gun at everyone. Casey asked, do you want me to open it and went to put the code in. She put it in a couple of times but it didn't open. The heavy male then said she had 10 seconds to open it or he was going to shoot her. She put the code in again and the safe opened. He grabbed the drawer and started taking the money. Then along came the skinny individual with the four customers. The heavy set male took Casey back to the front to empty out the registers, meanwhile the skinny one was taking more money, he noticed one of the customers moving and before you know it the customer pulled out his gun and started to chase the robber. Jamal told me to call the police. I stayed in the back until Jamal came there again, I know it was clear that the robbers were gone."

[12] In his appellate brief, the defendant asserts that the court admitted the clips over defense counsel's objection. The record reflects, however, that, prior to the prosecutor publishing the exhibit to the jury, defense counsel stated, "[t]here's no objection. We've agreed to the exhibit coming in."

[13] The court, *Dennis*, *J.*, subsequently found that the defendant had violated a term of probation, which he was then serving in connection with a prior conviction under a separate docket number, CR-14-149028-T, as a result of his having committed the restaurant robbery and sentenced him to forty months to serve concurrently with the sentence on his conviction

of the criminal charges for the restaurant robbery in docket number CR-18-0095601-T. Although the defendant also listed the judgment finding him in violation of his probation on his appeal form, he has failed to brief any claim relating to that judgment, nor did he list any claim related to that judgment on his statement of issues on appeal. We, therefore, dismiss the appeal to the extent that it purports to challenge the judgment finding him in violation of his probation. See *State* v. *Bletsch*, 86 Conn. App. 186, 188 n.3, 860 A.2d 299 (2004), aff'd, 281 Conn. 5, 912 A.2d 992 (2007); *State* v. *Gardner*, 85 Conn. App. 786, 787 n.1, 859 A.2d 41 (2004); *State* v. *Hannon*, 56 Conn. App. 581, 583 n.2, 745 A.2d 194 (2000), cert. denied, 274 Conn. 911, 876 A.2d 1203 (2005); see also *Casiraghi* v. *Casiraghi*, 200 Conn. App. 771, 772 n.1, 241 A.3d 717 (2020) (deeming abandoned those aspects of appeal raised on appeal form and in statement of issues on appeal but not briefed). Accordingly, our decision in this appeal relates only to the judgment of conviction in docket number CR-18-0095601-T.

[14] Included in his arguments against the use of showup identification procedures in general, the defendant contends that "Connecticut courts view them with a jaundiced eye" and cites to ten decisions of our appellate courts. In parentheticals, the defendant asserts that the ten cases support the position that the court "assum[es] procedure unnecessarily suggestive" or "hold[s] procedure unnecessarily suggestive." In its brief, the state responds to the defendant's contention and asserts that "[i]n all but one of the cases cited by the defendant, however, the court ultimately held that the showup identification evidence at issue was *properly admitted* and there was no violation of the defendant's due process rights." (Emphasis in original.)

In several of the cases, decided over the past few decades and relied on by the defendant, the court "assum[ed]" the procedure was unnecessarily suggestive as a means to reach the second prong of the analysis, reliability. See, e.g., *State* v. *Ruiz*, supra, 337 Conn. 624 ("even if we were to assume . . . that it was unnecessarily suggestive," the witness' identification was reliable). In one of the cases cited by the defendant, the court concluded that the identification procedure was not unnecessarily suggestive because it was justified by exigencies, as in *State* v. *Wooten*, supra, 277 Conn. 677. See *State* v. *Watson*, 50 Conn. App. 591, 603–604, 718 A.2d 497, cert. denied, 247 Conn. 939, 723 A.2d 319 (1998), cert. denied, 526 U.S. 1058, 119 S. Ct. 1373, 143 L. Ed. 2d 532 (1999), cert. dismissed, 255 Conn. 953, 772 A.2d 153 (2001). The sole case, cited by the defendant, in which the court found that the identification was improperly admitted, is distinguishable on its facts. See *State* v. *Mitchell*, 204 Conn. 187, 202, 527 A.2d 1168 (showup identification procedure was conducted at nonneutral setting, hospital; victim was wheeled past defendants twice; and defendants were viewed as pair, not individually), cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987). In the remainder of the cases cited by the defendant, the court ultimately found that, although the circumstances did not necessitate a showup identification procedure, the identification was sufficiently reliable, and therefore, properly admitted. See, e.g., *State* v. *Brown*, 187 Conn. 602, 617, 447 A.2d 734 (1982).

[15] In support of his argument, the defendant relies on precedent from several federal circuit courts of appeals and the courts of other states. Given the availability of controlling appellate authority in our state, we decline the defendant's invitation to consider precedent from those courts.

[16] The defendant contends that, "[i]f the perpetrators had more than one gun, then they would not have had to share a gun during the robbery"; however, requiring the officers to make an assumption that the perpetrators were no longer armed due to this speculation would run contrary to the police "duty to protect the public." *State* v. *Revels*, supra, 313 Conn. 775; id. ("[T]he defendant's argument suggests that the police should have assumed that no further criminal activity would occur in the immediate future, and therefore, that quick action was not necessary to protect the public. Nothing in our case law supports this conclusion, which would require the police to make assumptions inconsistent with their duty to protect the public.").

[17] The defendant contends that the fact that "Brinkley identified the defendant nearly ninety minutes after the crime . . . belies any exigency" and cites to cases in support of his position that showup identifications are permissible "less than an hour" after the crime was committed. The state responds that the one hour "guideline" is one of "the defendant's own creation" and notes that the defendant has not "cited a single case where a court found a showup identification was inadmissible simply because it occurred more than an hour after the crime." Additionally, the state argues that "both this court and our Supreme Court, as well as courts from other

jurisdictions cited by the defendant, have all concluded that showup identifications occurring well over an hour after the crime were not unnecessarily suggestive due to exigent circumstances." We agree with the state. See *State* v. *Hamele*, 188 Conn. 372, 377–78, 49 A.2d 1020 (1982) (showup conducted no more than two hours after incident not impermissibly or unnecessarily suggestive); *State* v. *Bell*, 13 Conn. App. 420, 425, 537 A.2d 496 (1988) (showup conducted less than two hours after crime was found to be reasonably necessary).

[18] In making his assertion, the defendant appears to rely on the trial testimony from Sergeant Dunn and Detective Cruz during cross-examination by defense counsel. In response to defense counsel's question of whether there was an emergency that required a showup identification, Sergeant Dunn replied, "No, there was a request from the captain." In response to defense counsel's question regarding whether there was anything preventing them from doing a photographic lineup with the other witnesses, Detective Cruz initially responded that, "I think for this case and my training and experience the showup was appropriate. I believe there is enough probabl[e] cause on that night to arrest the two defendants for the robbery." When asked again, seconds later, however, Detective Cruz responded, "[n]o."

[19] In asserting that "Brinkley was unhurt," the defendant cites to Sergeant Dunn's testimony on cross-examination in which he testified that Brinkley was not in a near death state, nor in physical distress. Although the defendant does not elaborate on this point further, he appears to be relying on the Milford Police Department General Orders, which the defendant introduced during the motion to suppress hearing, that state "[s]howup identification procedures are employed soon after a crime has been committed, when a suspect is detained at or near the crime, or under exigent circumstances such as the near death of the eyewitness or a victim." We note that during argument on the motion to suppress, the court addressed the defendant's argument on this point, and stated, "[w]as this not at or near the crime?" Moreover, our Supreme Court has found exigent circumstances exist, even where an eyewitness is "unhurt." See *State* v. *Revels*, supra, 313 Conn. 767, 770, 773–74 (eyewitness saw murder suspect from window of her apartment building more than 200 feet away; court found exigent circumstances to necessitate showup identification).

[20] When asked during oral argument before this court whether defense counsel had found any cases with a similar factual background, i.e., where the witness was brought to a location to identify a second suspect after already having identified a first suspect in the same location, defense counsel stated that he had not.

[21] Officer Joy testified that he could not recall whether the defendant was handcuffed during the showup identification. Officer Lennon testified that he "would assume" that the defendant was handcuffed at the time that he was identified by Brinkley "because he was apprehended in the woods as a suspect in an armed robbery, [and] it would be our policy to handcuff that individual." After further questioning, however, Officer Lennon testified that he did not recall whether the defendant was handcuffed.

[22] The factors discussed previously comport with the eyewitness identification instructions from the Milford Police Department General Orders, which the defendant introduced during the motion to suppress hearing. These instructions include: (1) "[s]uspects should not be transported back to the scene of the crime if avoidable . . . [and] [t]hey should never be transported to police station absent probable cause to arrest," (2) "the suspect should not be viewed when [he] is inside a police cruiser," (3) "[o]fficers must not say nor do anything that would convey to the eyewitness that they have evidence of the suspect's guilt," and (4) "[i]f the suspect is handcuffed, [he] should be positioned so that the handcuffs are not visible to the eyewitness."

[23] In light of our conclusion that the showup identification procedure was not unnecessarily suggestive, we need not address the defendant's claim that the identification was unreliable. See *State* v. *Revels*, supra, 313 Conn. 769 n.5.