******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

McDONALD, J., with whom ECKER and WESTBROOK, Js., join, dissenting. The preeminent American legal scholar on the law of evidence long ago recognized that showup[1] identifications are "next to worthless" and that "there is no excuse for jeopardizing the fate of innocent men by such clumsy, antiquated methods . . . ." 4 J. Wigmore, Evidence (3d Ed. 1940) § 1130, p. 214 n.2. More than eight decades after Professor John Henry Wigmore first made this statement in his treatise—a treatise retired United States Supreme Court Justice Felix Frankfurter properly noted was "unrivaled as the greatest treatise on any single subject of the law"[2]— courts still regularly admit this highly unreliable evidence, despite an abundance of scholarship and science demonstrating that showup identifications are inherently suggestive, unnecessary, and inaccurate.

Today, this court considers whether such a highly suggestive and inherently unreliable showup identification was properly admitted into evidence at the trial of the defendant, Gregory E. McLaurin. The majority recognizes that the showup at issue was "suggestive." Part II of the majority opinion. Although the trial court and the Appellate Court determined that an exigency

[1] "A [showup] is an identification procedure in which the police present a single suspect to an eyewitness and then ask the eyewitness whether the suspect is the perpetrator. Typically, [showups] are conducted in the area of, and shortly after, the alleged crime. Often, when the eyewitness views the sole suspect, the suspect will be in police custody and may even be [handcuffed] or locked in a police squad car. [Showups] are very convenient for law enforcement as they allow for a quick and easy resolution of the investigation, without having to take the time to assemble a lineup or [photographic] array." (Footnotes omitted.) M. Cicchini & J. Easton, "Reforming the Law on Show-Up Identifications," 100 J. Crim. L. & Criminology 381, 388–89 (2010).

[2] F. Frankfurter, "John Henry Wigmore: A Centennial Tribute," 58 Nw. U. L. Rev. 443, 443 (1963). Justice Frankfurter continued: "I make no exception to this superlative statement. It is not only a great treatise on the law of evidence, but it is a masterpiece of scholarship, conveyed through a distinguished style of writing." Id.

made the identification procedure not unnecessarily suggestive, the majority concludes that it does not need to determine whether the showup was unnecessarily suggestive because, even if it was, the identification was reliable. I write separately for two reasons. First, I analyze the exigent circumstances exception on which the police often rely to justify unnecessarily suggestive identification procedures, which the majority declines to address. Second, I disagree with the majority that the identification at issue in the present case was reliable.

Despite the Appellate Court's conclusion to the contrary, I cannot conclude that there was an exigency in the present case that required this unnecessarily suggestive identification procedure. See *State* v. *McLaurin*, 216 Conn. App. 449, 466, 470, 285 A.3d 104 (2022). Prior to the showup identification procedure, the police (1) already had two suspects in custody and had stopped searching for the perpetrators, (2) conceded they had probable cause to arrest the defendant without the showup identification, (3) had recovered the gun used in the robbery, and (4) knew that the identifying witness was not injured. Although it may well have been more convenient for the police to conduct a showup identification rather than to undertake the effort to formulate a more reliable photographic array or lineup identification; see General Statutes § 54-1p; mere convenience does not constitute an exigent circumstance in which the use of a showup is the only feasible identification procedure. If the situation at issue can be characterized as exigent, then I cannot imagine any situation in which the police would not be justified in conducting a showup identification shortly after a crime is committed. This supposition would almost completely undermine the legislature's goal in passing § 54-1p, which sets forth specific procedures for the state and municipal police to follow when conducting identifications. Our legislature passed § 54-1p, recognizing that eyewitness identifica-

tions are "prone on the one hand to stunning inaccuracy but at the same time [are] often the most compelling testimony in the courtroom." Conn. Joint Standing Hearings, Judiciary, Pt. 6, 2011 Sess., p. 1910, remarks of Senator Martin M. Looney. It is likely that the Appellate Court followed a line of cases from this court that have held that showups conducted under similar circumstances were not unnecessarily suggestive. These cases, which long predate the legislature's 2011 mandate for reliable identifications in § 54-1p, have incorrectly expanded the circumstances that may be characterized as "exigent." It is long past time that this court limit the admissibility of showup identifications to true exigencies, in which a showup is the only feasible identification procedure available to law enforcement. The majority's application of the factors set forth in *Neil* v. *Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), highlights the dangers with both the exigency exception and the reliability analysis under the federal constitution. I also disagree with the majority's conclusion that, under the factors set forth in *State* v. *Harris*, 330 Conn. 91, 118–19, 131, 133, 191 A.3d 119 (2018), the identification was reliable. Accordingly, I respectfully dissent.

The context in which the showup identification occurred is critical to evaluating whether the identification procedure employed by the police was unnecessarily suggestive. In 2018, two individuals robbed a restaurant on a busy commercial street in Milford. At approximately 8:30 p.m., two Black men entered the restaurant; one was short and heavyset, and the other was tall and thin. Both men wore ski masks, jeans and hooded sweatshirts. The masks left their "eyes, mouths, and the skin around [them] . . . visible." *State* v. *McLaurin*, supra, 216 Conn. App. 451. The tall individual also wore a dark-colored coat and was holding a handgun. When the men entered the restaurant, there were three employees working and four customers

present. The men ordered the two employees who were working in the front of the restaurant and all of the customers into the back office at gunpoint. One of the employees, Jada Brinkley, "was so petrified . . . [that] she was screaming . . . 'oh my fucking God, I'm so fucking scared. We're going to die.' " The taller man handed the gun to the shorter one, who then pointed it at one of the employees and told her to unlock the safe. The employee complied, and the shorter man emptied the safe and stuffed the money in his pockets. The shorter man then led the employee to the front cash registers and ordered her to empty one of the cash registers. Around the same time, the tall man ordered the remaining individuals in the back office to turn over their cell phones. One of the customers, however, was armed, and, when he drew his weapon on the tall man, the tall man ran out of the restaurant. That customer then went to the cash register area and knocked the gun out of the shorter individual's hand. The shorter man then ran out of the restaurant as well.

A Milford police officer, Matthew Joy, arrived at the restaurant at approximately 8:43 p.m. The employees and customers described the two men to Joy and informed him that the two individuals fled on foot. Joy relayed this information to other officers over the police radio. Joy also located a gun on the floor, behind the front counter. As the Milford police began searching for the suspects, a passing motorist informed them that he saw two Black males run across the road and into a nearby vacant parking lot that bordered a wooded area. Officer Sean Owens and his police dog entered the woods behind the vacant parking lot, and the dog followed a scent to a path along the edge of the woods. Owens spotted an individual, approximately fifteen yards away, who matched the description of the shorter suspect. The man ignored Owens' command to "get [his] hands up" and to get "down on the ground," and

the man, instead, reached for his waistband. Owens' police dog subdued the man by biting his leg. Owens and his dog subsequently left the area to search for the second suspect.

Officer Christopher Deida searched the suspect and found a kitchen knife and $868 in the front pockets of his sweatshirt. Deida asked the man several times, "where's the other guy you were with?" After initially claiming that he did not know what Deida was talking about, the man told Deida that "his friend 'jumped the fence' and pointed to a nearby chain-link fence with barbed wire that ran along the wooded area." *State* v. *McLaurin*, supra, 216 Conn. App. 454–55. The police then escorted the man to the nearby vacant parking lot. The shift commander told Sergeant Christopher Dunn to "do the witness [identification]" in the parking lot. Dunn then instructed Joy to conduct an eyewitness showup identification in the parking lot. Joy chose to have Brinkley identify the suspect because she "had the best view of the suspects," and Joy thereafter drove Brinkley to the parking lot.

When they arrived at the parking lot, Joy read Brinkley a preprinted rules and instructions form for identification procedures. Specifically, he told Brinkley that "she was going to view some people. It may or may not be the person that she had seen during the incident but that it is important to clear innocent persons [of suspicion] as well, and . . . after making an identification, she shouldn't talk about the process to anyone." Joy then lowered the rear window of his patrol car, so that Brinkley could see the man whom the police had detained. Brinkley quickly identified the man as the shorter masked individual. The police later identified him as Royshon Ferguson. Joy then drove Brinkley back to the restaurant.

Meanwhile, Owens and his dog could not locate the second man after a twenty to thirty minute search.

Eventually, Owens ended the search. As Owens walked toward his car, however, his dog alerted him to the presence of another individual. Owens saw an unmasked man, approximately fifty to sixty yards from where Ferguson was apprehended, who "was hunkered down in head-high thickets . . . ." Owens detained the man, and other officers brought him to the parking lot where the earlier identification had taken place.

At 9:42 p.m., Joy was instructed to bring Brinkley back to the parking lot for a showup identification of the second man. Joy drove Brinkley to the parking lot, read her the same instructions he had previously read her for the earlier identification, and lowered the rear window. Joy's car was about "two or three car lengths" from the man, who was unmasked and sitting in the back of an ambulance. At approximately 9:56 p.m., Brinkley identified the man as the taller masked robber. The police later identified the man as the defendant.

Prior to trial, the defendant moved to suppress Brinkley's showup identification "as the [fruit] . . . of improper, unreliable and unnecessarily suggestive police identification procedures . . . [that were] so highly and unnecessarily suggestive and conducive to the making of irreparable misidentifications . . . [that they] render[ed] any identification[s] procured thereby unconstitutionally unreliable . . . ." On the first day of trial, the trial court heard arguments and testimony on the defendant's motion. Joy testified that he did not remember whether, at the time of the identification, the defendant was handcuffed, whether his hands were in front of his body or behind his back, or whether any police officers were next to him. There was testimony, however, that it is Milford Police Department policy to keep an armed robbery suspect handcuffed after having detained him. Joy also testified that exigent circumstances necessitated a showup identification of the defendant because an armed robbery involving a fire-

arm had just occurred and the suspects, who had left the scene on foot, could possibly still have other weapons on their person. When questioned by defense counsel on cross-examination, Joy agreed that the police had "show[n] [Brinkley] somebody after a robbery, who was surrounded by the police and medical personnel [while Brinkley was] in the back of a police car, and [that Joy had asked her], is this the guy who did it . . . ?" Finally, Detective Sergeant Michael Cruz, who led the investigation, confirmed that nothing "prevent[ed] [the police from] doing a [photographic array or] a live lineup with the defendant . . . ."

For her part, Brinkley testified that she had no memory of the event or the night in question. She testified: "I just got into a car accident. I was unconscious, don't remember. I smoke weed. . . . I do not remember this night . . . ." The prosecutor then showed Brinkley several clips of video footage from Joy's body cam in which Brinkley can be heard identifying Ferguson, identifying the defendant, and discussing the suspects' physical features and clothing. Brinkley confirmed that it was her in the videos but, again, explained that she had no recollection of the captured events. Thereafter, Brinkley also testified that she "[m]ost likely" smoked "weed" on the day of the robbery but ultimately concluded that she did not know for sure if she had done so.

Relevant to this appeal, Dunn was asked by defense counsel at trial whether there was an emergency that necessitated a showup identification. Dunn responded, "[n]o, there was a request from the captain." Defense counsel cross-examined Cruz as to whether "there [was] anything that prevented [the police officers] from doing a [photographic array] of [the defendant] with the witnesses and the employees of [the restaurant]?" Cruz responded that, "for this case," based on "my training and experience, the showup was appropriate. I believe there [was] enough probabl[e] cause on that

night to arrest the two [suspects] for the robbery." Cruz subsequently testified on cross-examination that there was nothing that prevented the officers from doing a photographic array with the eyewitnesses. Defense counsel then asked whether there was anything that prevented the officers from doing a lineup with the defendant and the restaurant employees, and Cruz responded, "[n]o."

In a brief ruling denying the motion to suppress, the trial court explained that it has "consider[ed] the testimony of . . . Joy and the testimony of . . . Brinkley . . . and . . . [found] that the identification, given all the facts and circumstances, was not unduly suggestive." The trial court subsequently denied the defendant's motion for articulation, which sought, among other things, an explanation as to what subordinate findings the court made to support its conclusion that the identification was not unduly suggestive. At the conclusion of trial, the jury found the defendant guilty on nine of the ten counts, and he was sentenced to twenty-five years of imprisonment, execution suspended after eighteen years, and five years of probation. The Appellate Court subsequently upheld the trial court's denial of the motion to suppress on the basis of the exigent circumstances' exception and affirmed the judgment of conviction. See *State* v. *McLaurin*, supra, 216 Conn. App. 466, 470, 479.

Following the first oral argument heard by this court, we, sua sponte, ordered the trial court to articulate the following: (1) "What subordinate findings did the trial court make to support its determination that Brinkley's identification 'was not unduly suggestive?' In particular, what portions of . . . Joy's and . . . Brinkley's testimony did the court credit and what portions, if any, did the court reject? The court should also articulate any other findings of fact necessary to support its determination." (2) "Assuming the identification was unduly

or impermissibly suggestive, articulate whether, under the totality of the circumstances, the identification was still reliable and the facts that support such a conclusion." And (3) "[a]rticulate the factual basis that supports the conclusion that an exigency existed under the circumstances of this case that justified the showup identification."

In its articulation, the trial court reiterated many of the facts of the robbery and subsequent identification procedure to conclude that Brinkley's identification was not unduly suggestive. The court explained that it "credited all of the testimony of . . . Joy and . . . Brinkley and did not reject any of it." It also noted that it took into account Brinkley's frequent marijuana use and the possibility that she was not wearing eyeglasses on the night of the incident. The court concluded that, even if the identification was unduly suggestive, the identification was reliable because it was "conducted in close temporal and geographical proximity to the alleged offense . . . [t]he police provided . . . Brinkley an opportunity to identify the defendant while her memory was still fresh . . . [and] . . . Brinkley identified both suspects quickly and without hesitation."[3] (Citations omitted.) Finally, the court concluded that an exigency existed, given that the police were responding to an armed robbery of a restaurant, that a gun was found on the floor of the restaurant, and that Brinkley stated that, at some unspecified point in time, she saw one of the men holding a gun, before he fled the scene.

---

[3] In making its reliability determination, the trial court also noted that it relied on, among other things, the facts that a firearm had been found in the restaurant and that Joy testified that he did not know how many weapons were involved in the incident. The court further explained that, "by conducting the showup identification . . . law enforcement [was able] to quickly eliminate any innocent parties so as to continue the investigation with a minimum of delay." These facts, however, have no bearing on the reliability determination.

## I

I agree with the majority that the proper standard for reviewing whether a pretrial identification procedure violates a defendant's due process rights is a mixed question of law and fact subject to our plenary review. See, e.g., *State* v. *Marquez*, 291 Conn. 122, 136–37, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009). "The test for determining whether the state's use of an [allegedly] unnecessarily suggestive identification procedure violates a defendant's federal due process rights derives from the decisions of the United States Supreme Court in *Neil* v. *Biggers*, [supra, 409 U.S. 196–97], and *Manson* v. *Brathwaite*, 432 U.S. 98, 113–14, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). As the court explained in *Brathwaite*, fundamental fairness is the standard underlying due process, and, consequently, reliability is the linchpin in determining the admissibility of identification testimony . . . . Thus, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, if it is found to have been so, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Ruiz*, 337 Conn. 612, 621–22, 254 A.3d 905 (2020).

There can be little doubt that the showup identification at issue in the present case was highly suggestive. Without any discussion, the majority agrees that the showup was at least "suggestive" but concludes that it need not decide whether it was *unnecessarily* suggestive because, even if it was, the identification was reliable. Part II of the majority opinion. Because the suggestiveness inquiry dovetails with the reliability inquiry,

I begin by analyzing the former issue.[4] We have recognized that showup identifications are "inherently and significantly suggestive  .  .  .  ." (Internal quotation marks omitted.) *State* v. *Ruiz*, supra, 337 Conn. 622. This observation is based on the commonsense insight that, ordinarily, "a one-to-one confrontation between a [witness] and the suspect presented . . . for identification . . . conveys the message to the [witness] that the police believe the suspect is guilty." (Internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 772–73, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil* v. *Biggers*, supra, 409 U.S. 198. "For this reason, when not necessary, the presentation of a single suspect to a witness by the police (as opposed to a lineup, in which several individuals are presented to the [witness], only one of whom is the suspect) . . . has . . . been widely condemned  .  .  .  ." (Internal quotation marks omitted.) *State* v. *Ruiz*, supra, 622.

I recognize, however, that "the use of a one-on-one showup identification procedure does not invariably

---

[4] It bears emphasis that the reliability of an identification in substantial part depends on the identification procedure's degree of suggestiveness because the latter taints the former. Cf. *Neil* v. *Biggers*, supra, 409 U.S. 198 ("the primary evil to be avoided [by employing a nonsuggestive identification procedure] is a very substantial likelihood of irreparable misidentification" (internal quotation marks omitted)); National Research Council of the National Academies, Identifying the Culprit: Assessing Eyewitness Identification (The National Academies Press 2014) p. 9, available at https://nap.nationalacademies.org/read/18891/chapter/3 (last visited July 18, 2025) ("Accurate eyewitness identifications may aid in the apprehension and prosecution of the perpetrators of crimes. However, inaccurate identifications may lead to the prosecution of innocent persons while the guilty party goes free. It is therefore crucial to develop eyewitness identification procedures that achieve maximum accuracy and reliability." (Footnote omitted.)). Indeed, that is the purpose of a proper identification procedure—to make the resulting identification reliable.

constitute a denial of due process, as it may be justified by exigent circumstances." Id. In *Stovall* v. *Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), the seminal exigency case, the United States Supreme Court concluded that the showup identification at issue was admissible because it was "the only feasible procedure" when the victim was gravely injured. (Internal quotation marks omitted.) Id., 302. In 1993, in *State* v. *Wooten*, 227 Conn. 677, 686–87, 631 A.2d 271 (1993), this court went well beyond this rationale when it concluded that "enabling the police to focus their investigation and providing the victim an opportunity to identify her assailant while her memory was still fresh . . . were sufficient [exigencies] to prevent the identification procedure from being unnecessarily suggestive." *State* v. *Ledbetter*, 275 Conn. 534, 550, 881 A.2d 290 (2005) (overruled in part on other grounds by *State* v. *Harris*, 330 Conn. 91, 191 A.3d 119 (2018)), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006). This court has reached the same conclusion in subsequent cases that involved similar factual circumstances. See, e.g., *State* v. *Revels*, supra, 313 Conn. 773–74; *State* v. *St. John*, 282 Conn. 260, 278–79, 919 A.2d 452 (2007). We have also said, however, that an exigency exists only when the showup procedure "was *necessary* to allow the police to eliminate quickly any innocent parties so as to continue the investigation with a minimum of delay, if the victim excluded the defendant as a suspect or was unable to identify him."[5] (Emphasis added;

---

[5] The word "necessary" has more than one meaning in the law. See, e.g., *New England Pipe Corp.* v. *Northeast Corridor Foundation*, 271 Conn. 329, 336–37, 857 A.2d 348 (2004) ("Webster's Third New International Dictionary defines the term 'necessary' as '[something] that cannot be done without: that must be done or had: absolutely required: essential, indispensable' "); *West Hartford* v. *Talcott*, 138 Conn. 82, 91, 82 A.2d 351 (1951) ("[n]ecessary, in legislative [a]cts according the right of eminent domain, does not mean an absolute or indispensable necessity, but only that the taking provided for is reasonably necessary" (internal quotation marks omitted)). Under any definition, it was not necessary for the police to eliminate the suspects with great urgency in the circumstances of this case.

internal quotation marks omitted.) *State* v. *Ruiz*, supra, 337 Conn. 623.

I agree with the defendant that, since *Stovall*, numerous courts, including this one, have incorrectly expanded the scenarios that may constitute an exigency to include many situations in which a showup procedure is not the only feasible identification procedure and that, therefore, do not involve a true exigency. Despite widespread recognition for decades that showups are "next to worthless"; 4 J. Wigmore, supra, § 1130, p. 214 n.2; thirty-eight years have passed since this court or the Appellate Court has concluded that a showup identification procedure must be suppressed. See *State* v. *Mitchell*, 204 Conn. 187, 200–204, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987).

This court must rein in an ever-expanding meaning of "exigency" that has become so diluted in application that it allows the police to use a showup procedure in nearly all police investigations in which suspects are detained shortly after a crime has occurred, notwithstanding the fact that the resulting identifications are inherently and unnecessarily unreliable. See part II of this opinion. Indeed, in *Stovall*, the United States Supreme Court concluded that the showup identification was admissible because "[n]o one knew how long [the victim] might live . . . [and she] could not visit the jail, [so] the police followed *the only feasible procedure* and took [the suspect] to the hospital room" for the showup. (Emphasis added; internal quotation marks omitted.) *Stovall* v. *Denno*, supra, 388 U.S. 302. In the context of a showup identification, an exigency requires circumstances that render the showup procedure the only feasible option. Administrative convenience is not enough; nor is the mere hypothetical possibility that a dangerous person may remain at large if a showup is not conducted without delay.

In a truly exigent situation—such as when a showup is the only feasible identification procedure in light of a gravely injured witness—the totality of the circumstances may warrant a showup identification, despite the questionable benefit showups provide. As a result, I do not propose any categorical bans on the admission of showup identifications; rather, I would limit the factual circumstances under which an identification obtained by a showup procedure would be admissible at trial. The nature of the exigency must truly necessitate the use of this highly suggestive and unreliable identification procedure. After all, unnecessarily suggestive identification procedures increase the likelihood of misidentification, and that increased chance is gratuitous. See, e.g., *Neil* v. *Biggers*, supra, 409 U.S. 198. Accordingly, I would limit the use of showup identifications to true exigencies, in which there is a demonstrated need for the showup that law enforcement can actually articulate, and which is detailed and specific to the circumstances presented. Generalized concerns for public safety are present in every criminal investigation. By definition, not every investigation can create an exigency. See, e.g., The American Heritage College Dictionary (4th Ed. 2007) p. 489 (defining "exigency" as "[a] pressing or urgent situation"); Ballentine's Law Dictionary (3d Ed. 1969) p. 1021 (defining "public exigency" as "[a] sudden and unexpected happening, an unforeseen occurrence or condition"); see also, e.g., *United States* v. *Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007) (exigency requires "extraordinary urgency"), cert. denied, 555 U.S. 858, 129 S. Ct. 129, 172 L. Ed. 2d 99 (2008); *United States* v. *Concepcion*, 983 F.2d 369, 377 (2d Cir. 1992) (showup may be permissible only when there is "overriding necessity"), cert. denied sub nom. *Frias* v. *United States*, 510 U.S. 856, 114 S. Ct. 163, 126 L. Ed. 2d 124 (1993).

The present case highlights the problems inherent in showup identifications. It is clear that no exigency

existed that made a showup identification the only feasible identification procedure. The police admitted that they did not need to conduct a showup, and nothing prevented them from conducting either a lineup or photographic array procedure, as mandated in § 54-1p. Moreover, Brinkley and the other victims were unhurt, the defendant and his accomplice, who had large amounts of cash stuffed in the pockets of his sweatshirt, were in police custody, and the police had recovered a gun in the restaurant. Although I recognize that Joy testified that "you don't know if they're still armed," such a generalized concern is not sufficient to create an exigent circumstance in which a showup identification is the *only* feasible identification procedure. This is not a situation in which a suspect had used a weapon to seriously injure a victim and then fled with the weapon. Here, the perpetrators used only one gun during the robbery, which was recovered by the police at the scene, and no one was physically injured during the robbery. Accordingly, I conclude that the showup identification procedure in the present case was impermissibly suggestive.

## II

Having concluded that Brinkley's showup identification of the defendant was unnecessarily suggestive, I must consider whether the trial court correctly concluded that Brinkley's identification of the defendant was nevertheless reliable under the totality of the circumstances. An identification that is the product of an unnecessarily suggestive identification procedure will nevertheless be admissible, despite the suggestiveness of the procedure, if the identification is reliable in light of all of the relevant circumstances. See, e.g., *State* v. *Marquez*, supra, 291 Conn. 141–42. The defendant contends that "different factors govern reliability under the federal constitution and the state constitution; [see *State* v. *Harris*, supra, 330 Conn. 108, 118–19, 131, 133;

and that] Brinkley's identification satisfies neither [test]."[6] I conclude that Brinkley's identification was not reliable.

In *Neil* v. *Biggers*, supra, 409 U.S. 188, the United States Supreme Court set forth the following list of factors to aid courts in determining whether an unnecessarily suggestive identification is reliable under the federal constitution: "[1] the opportunity of the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of his [or her] prior description of the criminal, [4] the level of certainty demonstrated at the [identification], and [5] the time between the crime and the [identification]." *Manson* v. *Brathwaite*, supra, 432 U.S. 114, citing *Neil* v. *Biggers*, supra, 199–200.

Recognizing that the federal constitution establishes a minimum national standard and that states are permitted to afford greater protections, in *State* v. *Harris*, supra, 330 Conn. 91, we considered whether the due process provision of article first, § 8, of the state constitution "affords greater protection than the federal due process clause with respect to the admissibility of an eyewitness identification following an unnecessarily suggestive identification procedure." Id., 114. We concluded, "as a matter of state constitutional law, that it [was] appropriate to modify the *Biggers* framework to conform to recent developments in social science and the law."[7] Id., 115. Accordingly, "we endorse[d] the fac-

---

[6] The majority states that it is "skeptical that the defendant truly makes out a reviewable claim under the state constitution . . . ." Part II of the majority opinion. Insofar as the defendant analyzes the factors for determining reliability under our state constitution, which we first articulated in *State* v. *Harris*, supra, 330 Conn. 118–19, 131, 133, I disagree.

[7] Given the numerous problems posed by showup identifications, some courts have modified the factors they will consider when deciding if a showup identification is admissible. For example, the Kansas Supreme Court now requires a more thorough analysis of the circumstances under which the identification was made. It considers, among other things, "(1) the opportunity of the witness to view the actor during the event; (2) the witness' degree of attention to the actor at the time of the event; (3) the witness'

tors for determining the reliability of an identification that we identified as a matter of state evidentiary law in *State* v. *Guilbert*, [306 Conn. 218, 253–54, 49 A.3d 705 (2012)]; and we adopt[ed] the burden shifting framework embraced by the New Jersey Supreme Court in [*State* v. *Henderson*, 208 N.J. 208, 288–89, 27 A.3d 872 (2011)] for purposes of allocating the burden of proof with respect to the admissibility of an identification that was the product of an unnecessarily suggestive procedure."[8] *State* v. *Harris*, supra, 115.

We concluded that a trial court should consider the eight "estimator variables" identified in *State* v. *Guilb-*

capacity to observe the event, including his or her physical and mental acuity; (4) whether the witness' identification was made spontaneously and remained consistent thereafter, or whether it was the product of suggestion; and (5) the nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly." *State* v. *Hunt*, 275 Kan. 811, 817–18, 69 P.3d 571 (2003). I agree with our sister court that these factors "present an approach to the identification issue [that] heightens . . . the reliability of such identification." Id., 818. Nevertheless, these enhanced factors may offer only marginal improvement because the problem remains that the showup procedure is inherently suggestive. See, e.g., T. O'Toole & G. Shay, "*Manson* v. *Brathwaite* Revisited: Towards a New Rule of Decision for Due Process Challenges to Eyewitness Identification Procedures," 41 Val. U. L. Rev. 109, 122 (2006).

Still other courts have taken a more revolutionary approach to showup identification procedures. Courts in New York and Massachusetts have rejected the factor-based analyses employed by the majority of jurisdictions and have opted instead for a simpler approach. If it is determined that the initial identification was unduly suggestive, then no further inquiry is needed, and the identification evidence is excluded. See *Commonwealth* v. *Johnson*, 420 Mass. 458, 462–63, 465, 471–72, 650 N.E.2d 1257 (1995); *People* v. *Adams*, 53 N.Y.2d 241, 250–51, 423 N.E.2d 379, 440 N.Y.S.2d 902 (1981). Both of these states, however, have recognized exceptions that amount to nothing more than police convenience and, as a result, swallow the general rule of inadmissibility. See, e.g., M. Cicchini & J. Easton, "Reforming the Law on Show-Up Identifications," 100 J. Crim. L. & Criminology 381, 395 n.70 (2010).

[8] "Under *Henderson*, the defendant bears the burden of adducing evidence indicating that the identification procedure undermined the reliability of the identification; if the defendant makes such a showing, the state must offer evidence to demonstrate that the identification nevertheless was reliable under the totality of the circumstances; if the state adduces such evidence, the defendant assumes the burden of proving a very substantial likelihood

*ert*, supra, 306 Conn. 253–54, which, we noted, "overlap considerably with the estimator variables" articulated by the New Jersey Supreme Court in *Henderson. State* v. *Harris*, supra, 330 Conn. 133. These variables include "the following propositions: (1) there is at best a weak correlation between a witness' confidence in his or her identification and the identification's accuracy; (2) the reliability of an identification can be diminished by a witness' focus on a weapon; (3) high stress at the time of observation may render a witness less able to retain an accurate perception and memory of the observed events; (4) cross-racial identifications are considerably less accurate than identifications involving the same race; (5) memory diminishes most rapidly in the hours immediately following an event and less dramatically in the days and weeks thereafter; (6) an identification may be less reliable in the absence of a double-blind, sequential identification procedure; (7) witnesses may develop unwarranted confidence in their identifications if they are privy to postevent or postidentification information about the event or the identification; and (8) the accuracy of an eyewitness identification may be undermined by unconscious transference, which occurs when a person seen in one context is confused with a person seen in another." (Internal quotation marks omitted.) Id., 118–19, quoting *State* v. *Guilbert*, supra, 253–54. Importantly, we emphasized that "these variables are neither 'exclusive' nor 'frozen in time.' " *State* v. *Harris*, supra, 134.

Our decision in *Harris* relied in large part on our understanding of the developments in the science behind eyewitness identifications. We now know that eyewitness identification is the leading cause of wrongful convictions. See, e.g., *Tatum* v. *Commissioner of Correction*, 349 Conn. 733, 736–37, 322 A.3d 299 (2024);

of misidentification. See *State* v. *Henderson*, supra, 208 N.J. 288–89 . . . ." (Citation omitted.) *State* v. *Harris*, supra, 330 Conn. 115 n.18.

*State* v. *Guilbert*, supra, 306 Conn. 248–50. In one study, "three fourths of . . . convictions of innocent persons involved mistaken eyewitness identifications . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *White*, 334 Conn. 742, 778, 224 A.3d 855 (2020). In fact, numerous studies "have confirmed that eyewitness testimony is often hopelessly unreliable." *Commonwealth* v. *Johnson*, 420 Mass. 458, 467, 650 N.E.2d 1257 (1995). We know that eyewitness identification testimony is untrustworthy due to "the many vagaries of memory encoding storage and retrieval; the malleability of memory, the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and . . . other factors . . . ." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 130.

Research has shown that "[showups] are the *least reliable* of all the identification procedures, and their use further increases the incidence of wrongful convictions." (Emphasis added.) M. Cicchini & J. Easton, "Reforming the Law on Show-Up Identifications," 100 J. Crim. L. & Criminology 381, 381 (2010). Showups have even "been called the most grossly suggestive identification procedure now or ever used by the police." (Internal quotation marks omitted.) *People* v. *Sammons*, 505 Mich. 31, 41–42, 949 N.W.2d 36 (2020). Empirical findings demonstrate that innocent suspects are more often identified in showups than lineups. Id., 44. Unlike a lineup or a photographic array, a showup pressures the eyewitness to identify "the individual [who] has been singled out as the suspect by law enforcement"; *Morales* v. *United States*, 248 A.3d 161, 172–73 (D.C. 2021); and leaves no room for error. See, e.g., *People* v. *Sammons*, supra, 44 ("in a showup, any mistaken identification will fall on the suspect"). As a result, identifications obtained through a showup procedure are "less reliable than properly administered

lineup identifications . . . ." *State* v. *Lawson*, 352 Or. 724, 742–43, 291 P.3d 673 (2012). This court has also recognized the problems with showup identifications. See, e.g., *State* v. *Wooten*, supra, 227 Conn. 686 ("almost any one-to-one confrontation between a victim of a crime and a person whom the police present as a suspect is presumptively suggestive . . . because it conveys the message to the victim that the police believe the suspect is guilty" (citation omitted; internal quotation marks omitted)).

Still more troublesome, as we acknowledged in *Harris*, is the fact that the approach used to evaluate the reliability of showups under the federal constitution "employs a malleable and outdated [facts and circumstances] analysis [using the *Biggers* factors]. As a result, unreliable [showup] evidence is routinely used against defendants in criminal trials."[9] M. Cicchini & J. Easton, supra, 100 J. Crim. L. & Criminology 381; see also, e.g., P. Nardulli, "The Societal Costs of the Exclusionary

---

[9] The pitfalls of showup identifications are not confined to the wrongful conviction of an innocent person—which would be severe enough to warrant extreme caution by itself. For example, when a witness makes a false identification during a showup procedure, the innocent suspect will very likely be arrested and prosecuted, and law enforcement will stop looking for the perpetrator. See, e.g., M. Cicchini & J. Easton, supra, 100 J. Crim. L. & Criminology 390; see also, e.g., K. Findley, "Toward a New Paradigm of Criminal Justice: How the Innocence Movement Merges Crime Control and Due Process," 41 Tex. Tech L. Rev. 133, 138 (2008); cf. Conn. Joint Standing Hearings, Judiciary, Pt. 7, 2011 Sess., p. 2034 ("Misidentification . . . harms everyone, not just the innocent who suffer the unique horror of wrongful conviction. It harms the police who find that their investigations are impeded . . . . It really harms prosecutions because when investigations are refocused the witness is rendered unusable . . . . And the community suffers because the real perpetrator is at large."). In contrast, with a lineup or a photographic array, if the witness makes an incorrect identification, she will identify an individual that the police know was purposefully inserted as a filler. E.g., M. Cicchini & J. Easton, supra, 390–91. As a result, "the [witness'] misidentification will be known to the police, who can then continue with their investigation and their search for the true perpetrator." Id., 391.

Rule Revisited," 1987 U. Ill. L. Rev. 223, 226 (discussing research showing that motions to suppress identifications are rarely granted). These malleable analyses tend to "[confuse] exigency with police convenience." M. Cicchini & J. Easton, supra, 402. The *Biggers* factors often fail to weed out unreliable identifications because these factors do not accurately assess reliability. See, e.g., id., 392 ("[s]ocial science research . . . has shown that most of the *Biggers* factors do not accurately measure reliability and, therefore, do not address the risk of misidentification"). We acknowledged as much in *Harris*, explaining that "*Guilbert* supports the proposition that, under our state constitution, the *Biggers* analysis is inadequate to prevent the admission of unreliable identifications that are tainted by an unduly suggestive procedure." *State* v. *Harris*, supra, 330 Conn. 121. Unfortunately, not only are showup identifications unreliable, and not only do the analyses used for determining their admissibility under the federal constitution provide little protection for a criminal defendant, but juries also find eyewitness identifications highly persuasive. See, e.g., M. Cicchini & J. Easton, supra, 411; see also, e.g., *State* v. *Guilbert*, supra, 306 Conn. 241–42.

In *Harris*, this court noted that another justification for concluding that our state constitution affords greater protection than the federal constitution was that our legislature has recognized the pervasive issue of misidentification. See *State* v. *Harris*, supra, 330 Conn. 134 n.32. In 2011, the legislature addressed the significant pitfalls of eyewitness identifications by mandating specific procedures for identifications that are conducted by the state or municipal police in No. 11-252, § 1, of the 2011 Public Acts (P.A. 11-252), titled "An Act Concerning Eyewitness Identification." See General Statutes § 54-1p (c) (requiring, among other things, that identification procedures be double-blind and that they include minimum number of "fillers" who fit suspect's

description). As we have explained, § 54-1p "demon-strates a clear legislative concern that suggestive identi-fication procedures are a significant cause of erroneous convictions and should be eliminated to the extent pos-sible." (Internal quotation marks omitted.) *State* v. *Har-ris*, supra, 134 n.32. One of the vice chairpersons of the Judiciary Committee remarked that, "[a]s many mem-bers of the [c]hamber may know . . . in cases [in which] we have wrongful identification, about 75 per-cent of them have to do with the procedure for having a witness identify what would be a potential perpetrator. This bill looks to incorporate into our statutes the latest scientific and best procedures." 54 H.R. Proc., Pt. 23, 2011 Sess., pp. 7812–13, remarks of Representative Gary A. Holder-Winfield. Similarly, retired Justice David M. Borden testified before the Judiciary Committee, explain-ing that "we now know because of the many DNA exon-erations in the past several years, that in the area of eyewitness identification we are doing something wrong. Of the approximately 270 DNA exonerations nationwide in the past several years, including several in Connecticut, more than 75 percent involve positive yet false eyewitness identifications." Conn. Joint Stand-ing Hearings, Judiciary, Pt. 6, 2011 Sess., p. 1809. Sena-tor Looney testified that, as a result of the highly inaccurate nature of eyewitness identifications, "we have an obligation to [e]nsure that [eyewitness] testi-mony is as accurate as possible."[10] Id., p. 1910. Overreli-ance on showup identifications frustrates the legislature's purpose of reducing the number of wrong-

---

[10] A primary focus of the legislature in discussing P.A. 11-252, § 1, was whether, when showing an eyewitness a photographic array, the police should present the photographs sequentially or simultaneously. See, e.g., Conn. Joint Standing Hearings, Judiciary, Pt. 7, 2011 Sess., p. 2018. There was broad consensus that "the . . . single most important issue . . . seems to . . . [be] the [double-blind] administration" of the photographic array. Id.; see also id., p. 2022. Even in 2011, showups were presumably so unreliable that legislators did not envision that practice being a significant part of criminal investigations and did not significantly address the practice.

ful convictions based on suggestive identification procedures. See, e.g., *State* v. *Harris*, supra, 134 n.32.

We noted in *Harris* that, as the cognitive science of eyewitness identification has developed, so, too, has our jurisprudence. See id., 118–21. In *State* v. *Guilbert*, supra, 306 Conn. 218, we determined that "expert testimony on eyewitness identification is admissible upon a determination by the trial court that the expert is qualified and the proffered testimony is relevant and will aid the jury." Id., 226. In doing so, we overruled earlier decisions from this court that held that the factors affecting eyewitness identification are within the knowledge of an average juror. See id., 234–53. We reasoned that our prior case law was "out of step with the widespread judicial recognition that eyewitness identifications are potentially unreliable in a variety of ways unknown to the average juror. This [broad-based] judicial recognition tracks a near perfect scientific consensus. The extensive and comprehensive scientific research, as reflected in hundreds of peer reviewed studies and meta-analyses, convincingly demonstrates the fallibility of eyewitness identification testimony and pinpoints an array of variables that are most likely to lead to a mistaken identification." (Footnotes omitted.) Id., 234–36.

Four years later, in *State* v. *Dickson*, 322 Conn. 410, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017), we further developed protections against inherently suggestive identifications. We concluded that "*any* [first-time] in-court identification by a witness who would have been unable to reliably identify the defendant in a nonsuggestive out-of-court procedure constitutes a procedural due process violation." (Emphasis in original.) Id., 426 n.11.

Finally, just last year, this court expanded the framework set forth in *Teague* v. *Lane*, 489 U.S. 288, 299–314,

109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989) (plurality opin-ion), for evaluating whether a new rule applies retroac-tively on collateral review by adopting a third exception to the *Teague* rule of nonretroactivity. See *Tatum* v. *Commissioner of Correction*, supra, 349 Conn. 752–53. In *Tatum*, we concluded that, "[g]iven the develop-ments in the science of eyewitness identification, the heightened risk of a wrongful conviction, and the fact that the petitioner raised eyewitness identification claims in his direct appeal . . . the rule articulated in *Dickson* must be applied retroactively on collateral review in the petitioner's case." Id., 763–64. Ongoing advancements in our understanding of the science behind eyewitness identifications serves only to bolster our reasoning in *Harris*, and many of the cases decided by this court prior to the legislature's adoption of § 54-1p should be reexamined and viewed through the lens of the public policy of the statute.

Applying the estimator variables that this court adopted in *Harris* to the present case, I conclude that, at the time of the identification, Brinkley was scared and probably "high," could not see the perpetrators' faces, may not have been wearing her eyeglasses, and, at trial, had no memory of the incident or the defendant. During the robbery, Brinkley was clearly, and understandably, terrified. She was described as "screaming . . . 'oh my fucking God, I'm so fucking scared. We're going to die.' " Science tells us that the reliability of an eyewitness identification can be diminished by a witness' focus on a weapon and that high stress at the time of the observation may render a witness less able to retain an accurate memory of the observed events. See, e.g., *State* v. *Guilbert*, supra, 306 Conn. 253. Thus, the second and third estimator variables support the defendant's contention that the identification was not reliable. See id.; see also *State* v. *Harris*, supra, 330 Conn. 118–19, 133. What's more, Brinkley testified that she "[m]ost

likely" smoked "weed" on the day of the robbery. We know that a "witness' drug use . . . at the time of the events in question . . . place[s] the issue of the witness' ability to perceive and to recall, and, ultimately, the witness' credibility, before the jury." (Footnote omitted.) *State* v. *Clark*, 260 Conn. 813, 823–24, 801 A.2d 718 (2002). The suspects were also wearing masks, which hid most of their faces from Brinkley's view. A perpetrator's wearing a mask "weigh[s] against reliability." *United States* v. *Garcia-Alvarez*, 541 F.3d 8, 14 (1st Cir. 2008). Brinkley also testified: "I just got into a car accident. I was unconscious, don't remember. . . . I do not remember this night . . . ." After viewing the clips of footage from Joy's body cam, in which she can be heard identifying the defendant, Brinkley confirmed that it was her in the videos but again explained that she had no recollection of the captured events. Finally, the first and sixth estimator variables also support a conclusion that the identification was unreliable because there is a weak correlation between Brinkley's confidence in her identification and the identification's accuracy, and the showup procedure was, of course, not a double-blind, sequential procedure. See, e.g., *State* v. *Guilbert*, supra, 253; see also *State* v. *Harris*, supra, 118–19, 133. Accordingly, guided by the estimator variables, I conclude that Brinkley's identification, which was the product of an unnecessarily suggestive procedure, was unreliable under our state constitution.

Despite the numerous indicia of unreliability, the majority concludes, on the basis of its analysis of the *Biggers* and *Harris* factors, that Brinkley's identification was sufficiently reliable to avoid any due process violation. See part II of the majority opinion. As I explained, showup identifications are "hopelessly unreliable." *Commonwealth* v. *Johnson*, supra, 420 Mass. 467. This case highlights why. The majority concludes that the first *Biggers* factor—the opportunity of the

eyewitness to view the criminal at the time of the crime; see *Neil* v. *Biggers*, supra, 409 U.S. 199; weighs in favor of reliability. See part II of the majority opinion. The majority so concludes, even though Brinkley may not have been wearing her eyeglasses and the suspects were wearing masks during the robbery. The majority overcomes these facts, reasoning that "Brinkley was in the front of the restaurant when Ferguson and the defendant entered, and that she then went into the back of the restaurant with them and stood next to the defendant while Ferguson ordered [one of the employees] to open the safe." Id. The majority also notes that the trial court articulated that Joy testified that he chose Brinkley to participate in the identification "because she was the employee closest to the front of the [restaurant, who] encountered the suspects first . . . ." (Internal quotation marks omitted.) Id. But proximity to a suspect is of little consequence when the suspect was wearing a mask.

As to the second *Biggers* factor, the majority concludes that Brinkley's "degree of attention" weighs in favor of reliability. Id.; see *Neil* v. *Biggers*, supra, 409 U.S. 199. In reality, Brinkley's "degree of attention" lends little support for reliability given that she was understandably terrified. See, e.g., *State* v. *Guilbert*, supra, 306 Conn. 253 (reliability of eyewitness identification can be diminished by eyewitness' focus on weapon and high stress). Employing the fourth *Biggers* factor, the majority also concludes that Brinkley's certainty that she was correctly identifying the perpetrator weighed in favor of reliability. See part II of the majority opinion; see *Neil* v. *Biggers*, supra, 199. Specifically, the majority concludes that "Brinkley's statements in the [police] body cam footage reveal that, at the time she identified the defendant, she did so with great certainty." Part II of the majority opinion. But it is now well established that "there is at best a weak correlation

between a witness' confidence in his or her identification and the identification's accuracy . . . ." (Internal quotation marks omitted.) *State* v. *Harris*, supra, 330 Conn. 118.

Even if the third and fifth *Biggers* factors—the accuracy of Brinkley's prior description of the defendant and the amount of time between the crime and the identification; see *Neil* v. *Biggers*, supra, 409 U.S. 199–200; weigh in favor of reliability, on balance, I cannot conclude that Brinkley's identification was reliable, even under the federal constitution. In sum, despite knowing that showup identifications are "next to worthless"; 4 J. Wigmore, supra, § 1130, p. 214 n.2; the majority concludes that an identification in which the eyewitness was scared and probably "high," may not have been wearing her eyeglasses, could not see the perpetrators' faces and, at trial, had no memory of the incident or the defendant, was reliable. I simply cannot agree.

The admission of a suggestive and unreliable identification requires reversal of a defendant's conviction unless the state establishes that it was harmless beyond a reasonable doubt. See, e.g., *State* v. *Artis*, 314 Conn. 131, 149, 156–57, 101 A.3d 915 (2014). This requires the state to prove that there was "strong, independent evidence of the defendant's guilt." Id., 157. If, however, the improperly admitted identification "may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) Id., 159. No strong, independent evidence of guilt exists in this case. Brinkley's unnecessarily suggestive and unreliable identification was the only identification of the defendant as one of the perpetrators. No physical evidence connected the defendant to the crime. In fact, the state laboratory eliminated the defendant as a source of DNA "from all [of] the evidence that [the laboratory] was able to make comparisons to," including the interior of one of the ski masks, the

magazine of the discarded gun, the kitchen knife, and the drawer of the cash register. I cannot conclude that the state has established that the improperly admitted identification had no tendency to influence the judgment of the jury. Accordingly, I would reverse the judgment of the Appellate Court and order a remand of the case for a new trial.

## CONCLUSION

"It is estimated [that] . . . more than 10,000 people a year [are] wrongfully convicted, most of whom were convicted as a result of a mistaken identification." S. Gambell, Comment, "The Need to Revisit the *Neil* v. *Biggers* Factors: Suppressing Unreliable Eyewitness Identifications," 6 Wyo. L. Rev. 189, 190–91 (2006). Even the more "reliable" eyewitness identification procedures are hopelessly unreliable. A showup identification procedure is even less reliable, which makes poor quality evidence even worse and increases the likelihood that this procedure will result in false identifications and wrongful convictions. It has long been a fundamental value determination of our society that "it is far worse to convict an innocent man than to let a guilty man go free." *In re Winship*, 397 U.S. 358, 372, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (Harlan, J., concurring). I agree. Not only are showups much more likely to result in wrongful convictions than other forms of identification, but showups conducted in situations that are not truly exigent, such as the present case, do not sufficiently serve the public interests of ensuring the safety of residents and holding guilty perpetrators to account. Thus, they have limited value in our criminal justice system. I cannot sanction the broad admissibility of showup identifications and would, instead, limit the admissibility of such identifications to true exigencies, in which a showup was the only feasible identification procedure. I also cannot subscribe to the majority's conclusion that the identification at issue in the present

case was reliable because, on balance, the facts point, unmistakably, in the opposite direction—toward unreliability. With concern for the number of wrongfully convicted citizens in this state, I respectfully dissent.